BURNETT, J.
The appeal is by the plaintiff from a judgment in favor of the defendant decreeing that he was entitled to divert and devote to beneficial use the natural flow of a stream of water known as “Southard” Creek, in Mendocino County, to the extent of two and one-half miner’s inches measured under a four-inch pressure, and also that he was the owner of a certain flume and ditch and a right of way across plaintiff’s land for a diverting system for the appropriation of said water.
The main controversy is as to the sufficiency of the evidence to support the material findings of the court, the claim of respondent being that he proved a prescriptive title. That a quantity of water had been for many years diverted from said creek and conveyed through a ditch and flume across plaintiff’s land and used upon the land of defendant for domestic purposes, and for the irrigation of a small tract of land, is abundantly shown and, indeed, is not disputed by appellant. It is, however, the contention bf the latter that the use originated and continued in permission or license, and not under a claim of right, and, therefore, could not be held to be adverse.
The witness, W. F. Van Bibber, testified that he first became acquainted with the ditch and flume “about 1881,” but that he could not tell whether the water ran at that time to the Landrum place but that it was running in that direction. In 1902, when the plaintiff’s water system was constructed and established, the witness was living on the old Southard place, and he testified that “we used the water of Southard Creek right along all the time. We used the same ditch and *167 flume that is there now. Well probably it ha's been overhauled, but then it came from the same direction. . . . When I was on the Southard place and Mr. Sherman was on the Landrum place he irrigated the same as we did, we tool? the water from about you know couple of days apiece. There were four families of us engaged in this ... We different people who were using the water at that time had a kind of an agreement between ourselves, simply a neighborly proposition. We tried to make what water we had go as far as it would.” There is nothing in this testimony to show that he asked permission of appellant or of anyone to use the water, or that he recognized the. authority of anyone, either before or after the contention of appellant arose, to question his right to the use of the water. The only fair inference from his testimony is that he used the water as though he owned it, and the only matter of argument was as to its division among the neighbors. It is true he stated: “During this time that I was on the William’s place, the question arose between me and the company as to whether or not I had the right to take the water.” He was not interrogated, however, any further in reference to it and we must assume that when the question arose, he asserted his right, and that it was acquiesced in by the company.
Mr. Eugene McPeak, also, knew something of the situation in early days. His place was about a mile and a half from the Landrum place. He bought it in 1877 and he lived there until 1910. He testified: “When I moved on my ranch in 1877 there was a ditch or flume from Southard Creek running through the Southard ranch. The water was being conveyed to a mill at that time and the mill was situated on the east side of the road.” After stating that the mill was destroyed some years ago, he proceeded: “After the mill was destroyed the water was flowing in the flume, run right on and went past what we call the Landrum place. . . . While the mill was running they used the water on the Landrum place for irrigation. After the mill was destroyed they continued to use the water on the Landrum place. . . . While I was living on the place where I moved in 1877 to three years ago I cannot recall to mind any year the water was not used to some extent on the Landrum place.”
Mr. Frank Davis had lived in the neighborhood for twenty years, and he testified: “The first time I was on the water *168 ditch across the road at the Landrum place was in 1874. The flume and the water as I remember it come in the ditch the way it is now and the flume come out of the ditch and run above the road. . . . After the mill was discontinued, I know that water ran on to the Landrum land east of the house and down north of the house. I do not know whether or not water was used on the Landrum place for domestic purposes but they were using it for irrigation, that is using it for irrigating gardens and stuff they had there. . . . Water was always flowing in that ditch coming out of the creek to my memory since I first seen it. ... I don’t remember I was ever there but what the water was there in that ditch, used the water all through there all summer, don’t remember of ever finding it when the water was not there.”
A. <T. Smith, another pioneer, purchased the Landrum place in 1892, and he testified: “I moved up on the place that spring after I purchased it, after I fixed it up a little. . . . When I moved on this place there was no mill there and there was no water ditch on the place. The water ditch was up to the line of the ranch. Water was flowing in the ditch some of the.time at that time. ... I made use of the water when I was on the ranch. I began the summer of 1892. I used the water there all the time in the summer time. There was D. W. Stoddard and at that time when I first went on theraneh there was George Endieott, on the Tibbets .place, and J. B. P. Williams were using the water. . . . They made use of that water at that time in 1892, they used it in the summer time, that is we used it alternately. ... We all used the water, generally Mr. Williams and Mr. Endieott when he was there and after he left Mr. Orr and myself and when it came to me to clean the ditch why we all got .together and said, ‘Boys, let’s go and clean the ditch,’ and we set a day for that and went and done that work. ... I didn’t get permission from anybody to use the water. The ditch was there and we cleaned it out and put the water in and used it.....When I used the water I used all I could get through the ditch at that time and I would have used more if I could have gotten it. While I was not using the water some of the other neighbors used it. Taken all together, the time I used it and the time my neighbors used it,- it consumed mostly all the time during the irrigating season. ... I took the water out of the ditch at the north end of the ditch, the ditch ended at the *169 end of the Southard ranch and I extended it. I maintained the ditch in that condition all the while I was on the ranch. . . . None of us made any objection to that work, we all did it together. Mr. Southard always consented to it. Mr. Williams never made any objection to my going and cleaning that ditch. . . . The new flume constructed five years ago has a better intake than the old flume and as a matter of fact it is not the same flume.”
The defendant testified that he purchased the place in 1906 and “on the twentieth day of September, 1906, or thereabouts, when I moved on the place the water was running* into the yard and off over the west side of the house. . . . The irrigation ditch led to the place. The next irrigating season I was there. That was not the same year I went away. I come back down in the fall. In 1907, the second year I was there, corn, alfalfa, potatoes and blackberries were irrigated. I suppose I irrigated about ten acres the first year. We used the water for drinking water, all purposes. During the time I was there the water was used by these other residents.” He further testified that he claimed the water right and that he “did not get or obtain the permission from anybody to use the water” and furthermore: “I used this water openly and it was in plain view of everybody that I was taking the water. Mrs. Hamilton took the place when I left and two Greeks moved on the place when she left. Mrs. Hamilton stayed on the place something like eight months and the Greeks stayed about the same length of time. Two Italians went on the place next. Some Italians are on the place now. ’ ’ He testified that these parties all used the water on the place for irrigation and “during the time I owned this property I have repaired the flume and ditch each year and I have put in about 640 feet of new flume. I have repaired it every year since I have been there.”
Guy Landrum, son of defendant, testified substantially as his father. Among other things, he said: “We used the water during the greater part of the time during the irrigating season. We kept the flume in repair and Mr. Willip helped us the first season and whoever happened to be on the ranch came up and helped us. We repaired it every year. I entered and went over the right of way for the purpose of repairing that flume every year. I asked nobody’s permission to go over there but Dad. When he said for me to go *170 I went and if he wasn’t there when it needed repairing I went. I had no authority to ask the Willits Water and Power Company for permission to go over this right of way and I never asked them.”
There was other testimony of a similar character, and it is quite apparent that the lower court was justified in concluding that the water was appropriated, and the ditch and flume were used, under such circumstances and in such manner as to justify the inference that the defendant and his predecessors in interest were thereby claiming and asserting that said privilege was a right appurtenant to said land. This use continued for many years longer than the statute requires to create a title by prescription, and the evidence upon which the lower court acted was amply sufficient to show the presence and operation of all the elements of adverse possession. Even if one concede that there was some evidence that the use was permissive, the most that can be said is, that thereby a conflict was created. The rule or principle that applies to a' situation like this is stated and discussed in Gurnsey v. Antelope Creek etc. W. Co., 6 Cal. App. 387, [92 Pac. 326], and it is sufficient to refer to that decision.
We think that there can be no doubt of the legal stability of the court’s conclusion as to the right of respondent to the use of the water and of the ditch and flume for the benefit of his land, but we come to a more difficult question when we consider the quantity of water that was awarded. The court decreed that ‘ cross-complainant, Joseph Landrum, is the owner of the right of way to divert and devote to a beneficial use the natural flow of the said stream known as Southard Creek, in the following amount, to wit: A continuous flow of two and one-half miner’s inches of water measured under a four inch pressure. ’ ’ The corresponding finding of fact' is; “That the cross-complainant and defendant herein and his predecessors in ownership to the lands described in the cross-complaint and in paragraph III hereof, for a period of more than five years continuously next prior to July 15, 1912, to wit, for a period of more than twenty years, continuously next prior thereto, used the waters of said Southard Creek to an amount equal to a continuous flow of twenty-four hours each day of two and one-half miner’s inches,” etc., and that said use “was open, notorious,” etc. It is to be observed that the court thus finds, not the amount of water that was c?qb *171 versely used for this long jperiod, hut what the court deemed equivalent to the quantity thus used. In his cross-complaint, defendant alleged that he and his predecessors in interest had used “the waters of said Southard Creek,’’ and “had conducted it through said ditch and flume to the full capacity of said flume,” etc. In the answer to this pleading, plaintiff denied that the amount of water used by cross-complainant and his predecessors in ownership, or either of them, was the full capacity of said flume, or ‘ any greater amount than a depth of one inch in said flume at infrequent and intermittent intervals, ’ ’ and as to this quantity it was alleged the use was by license and permission of plaintiff. This, of course, was a very important issue in the case, and it would appear that the court should have found definitely what quantity of water, if any, was thus continuously appropriated. (Riverside Water Co. v. Sargent, 112 Cal. 230, [44 Pac. 560]; Hayes v. Silver Creek Co., 136 Cal. 238, [68 Pac. 704].) If the award of a different quantity from that used was deemed advisable, it should at least appear what quantity was used. If the evidence showed that respondent' and his predecessors in interest had used ten inches of water for six hours continuously every day would it be sufficient for the court to conclude that this was equivalent to the use of two and one-half inches for the whole twenty-four hours and find accordingly ? The title by prescription is measured by the manner and extent of the use (Civ. Code, see. 806), and does not attach to something else that may be deemed equivalent.
The case would be no different if the court had concluded that the use of another flume and ditch was equivalent "to what was claimed and shown by the evidence, and had decreed that respondent was entitled to the equivalent.
In section 581. of Wiel on "Water Eights, third edition, it is said: “The principle declared by these authorities is that the rights of a party who has acquired a prescriptive title and the rights of one against whom said title is acquired, are mutual, and each is entitled to demand that the prescriptive right be exercised in the same manner that it was exercised while it was being acquired.”
Turning now to the evidence as to the amount of water which was used adversely we find it not altogether satisfactory. However, Mr. Donahue, the engineer, testified that a short time before the trial he measured the water flowing *172 jn the flume and found it to be 16.8 miner’s inches. Mr: Landrum was present when the measurement was made, and in his testimony he declared that this was about the amount in the flume when they were irrigating and that it was all appropriated for that purpose. There is evidence that this was used on four ranches, and it is contended by respondent that the four ranches divided the twenty-four hour period about equally. That is probably not an unreasonable inference from the evidence. Assuming, then, that the evidence warranted the conclusion that sixteen inches of water were used on defendant’s land for six hours daily for a sufficient period and under such circumstances as to create a prescriptive right, would that justify the court in determining that the right attached to a continuous flow of two and one-half inches % The use was of sixteen inches for six hours, in other words, and the court finds that respondent is entitled to two and one-half inches for twenty-four hours. Manifestly, appellant could not complain of the reduction of the quantity, but the time of appropriation might be of considerable moment. It is true that the change might be of advantage to appellant, but we think that the number of hours per day during which the water was used on respondent’s land is an important and material element, and that the prescriptive right must correspond in that respect with the evidence. If it be assumed, therefore, that the court found substantially that respondent used two and one-half inches of water continuously under a claim of right, etc., we consider it unsupported.
At any rate, if the change was to be made, evidence should have been offered that the continuous use of the lesser quantity was equivalent to the intermittent use of the larger, and the facts fully found in accordance therewith.
We can see no merit in the claim of appellant that the doctrine of estoppel applied by reason of the fact that plaintiff is a public service corporation, and defendant stood by and made no objection to the construction of its works ■ and allowed without protest his property to be taken for public use. In support of its contention appellant cites Gurnsey v. Northern Cal. Power Co., 160 Cal. 699, [36 L. R. A. (N. S.) 185, 117 Pac. 906]. Therein it was held that when a public service corporation, though it made its original entry upon an owner’s land without right, has been permitted without *173 objection to enter thereon and construct its works for which said land was appropriated, and such owner failed to bring any action until public interest by reason of such construction has intervened, the right of the owner to bring ejectment is denied, and he is remitted solely to his action for damages as the measure of his compensation. Said decision was based upon the ground of public policy and is eminently sound as applied to the facts of that case, and, it may be added, that the apparently opposite view advanced in Gurnsey v. Northern Cal. Power Co., 7 Cal. App. 534, [94 Pac. 858], grew out of the effort to state the general rule without particular attention to the well-settled exception.
If we concede that there is evidence in the record lending support to appellant’s contention in this matter, still, as we are required to view the case from the standpoint of respondent’s showing, we must hold that said doctrine has no application herein.
In the first place, respondent did not stand by and allow his property to be taken. The dam and diverting works of appellant were not constructed on the land now owned by respondent. They are on the stream above the intake of the flume of Landrum. Besides, his land was receiving the water at the time said works were constructed and the water system inaugurated, and appellant had notice of the claim to this overflow. This is shown by the reservation in the deed from Samuel Boechtel, a predecessor in interest of respondent, to appellant, as follows: “Nothing contained herein shall be deemed to waive any rights which I may have in or to any of the waters of Southard Creek or to the flume or water ditch leading from the same.” It is a fair inference, also, that by proper conservation of the water, there will be a sufficiency to meet the demands of both parties and, therefore, the public interest will suffer no detriment by reason of the claim of the defendant. We may cite as having some relation to the situation the following cases: Burr v. Maclay Rancho Water Co., 160 Cal. 268, [116 Pac. 715] ; Stevinson v. San Joaquin etc. Co., 162 Cal. 141, [121 Pac. 398] ; Southern Pacific Co. v. Spring Valley W. Co., 173 Cal. 291, [L. R. A. 1917E, 680, 159 Pac. 865].
It is contended that a change in the location of the flume and the point of diversion of the water has an important bearing upon the question of the right of respondent to conduct the *174 waters along .the present course. The right to the use of the water is, manifestly, distinct from a right to convey it along '• a certain definite channel. As far as the right of way is concerned, it must be shown, of course, that a certain definite line was used under a claim of right for the statutory period. The evidence does show some changes in the flume and ditch, but we think it is a fair inference that said flume and ditch have remained substantially the same since the beginning, and we may add that by the slight variation no greater burden was imposed upon the servient estate. Probably the most serious change was in reference to the point of diversion of the water, but as to this there is nothing to indicate that appellant was injured in the slightest. As to statutory -appropriations, indeed, the statute provides that, “The person entitled to the use may change the place of diversion if others are not injured by such change and may extend the ditch, flume, pipe or aqueduct by which diversion is -made to places beyond that where the first use was made.” It is true that this is not a case of statutory appropriation, but of prescriptive right to the use of the water, but there can be no differ- - ence in principle as to a change in the point of diversion. Indeed, in Perry v. Galkins, 159 Cal. 175, [113 Pac. 136], it is said: “An established right to divert the waters of a stream is not affected by a mere change of the placé of diversion if it causes no injury. ’ ’ The change in the point of diversion in the case is of no importance except as it involves a change in the location of the flume leading therefrom. The latter consideration might' be important as bearing upon the right of way to conduct the water. We think, as already suggested, however, that the conditions remained so essentially similar, while the water was being used, that it might be said the evidence is sufficient to support the finding of the court that the defendant has the right to use the ditch and flume for the purposes stated in the findings.
Some other points are discussed but we do not deem them of vital importance.
We are of the opinion that by reason of said defect as to the findings the judgment and order should be reversed and it is so ordered.
Chipman, P. J., and Hart, J., concurred.